UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SHIRLEY MAY BODDEN,

                                        Plaintiff,

                  -against-

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.
-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____ 12/14/201

14-CV-08731 (SN)

OPINION AND ORDER

**SARAH NETBURN, United States Magistrate Judge:**

Plaintiff Shirley May Bodden brings this action pursuant to Sections 205(g) and

1631(c)(3) of the Social Security Act (the "Act"), 42 U.S.C. §§ 405(g), 1383(c)(3), seeking

judicial review of the final determination of the Commissioner of Social Security (the

"Commissioner") denying her application for Supplemental Security Income ("SSI"). Bodden

moves for judgment on the pleadings to reverse or vacate the Commissioner's determination,

under Federal Rule of Civil Procedure 12(c), and the Commissioner cross-moves to uphold the

Commissioner's determination and dismiss the case.

Because I find that the administrative law judge ("ALJ") failed to apply the treating

physician rule correctly and did not properly analyze Bodden's credibility, the plaintiff's motion

to remand the case is GRANTED, and the Commissioner's motion for judgment on the pleadings

is DENIED. The case is remanded to the Commissioner for proper application of the treating

physician rule and the credibility analysis.

## PROCEDURAL BACKGROUND

Bodden first applied for SSI benefits in January 5, 2010, alleging disabilities of

depression, post-traumatic stress disorder and back pain. After her application was denied on

March 24, 2010, Bodden requested a hearing. ALJ Curtis Axelsen held a hearing on February 9, 2011, and issued a decision on April 20, 2011, denying Bodden's application for SSI. Bodden appealed ALJ's Axelsen's decision, and on September 18, 2012, the Appeals Council remanded Bodden's application, directing the ALJ to further develop Bodden's medical record and to provide more details regarding the weight given to her treating and non-treating physicians' opinions. ALJ Kenneth Levin held a second hearing on April 9, 2013, and issued a decision on April 24, 2013, in which he found that Bodden was not disabled. The decision to deny Bodden benefits was finalized on July 17, 2014, when the Appeals Council denied Bodden's request for a review of ALJ Levin's decision. This action followed.

On November 3, 2014, Bodden filed her complaint challenging the denial of her application for SSI under 42 U.S.C. §§ 405(g), 1383(c)(3). On May 27, 2015, Bodden moved for judgment on the pleadings, arguing that the ALJ had failed to (i) properly weigh the opinion of Bodden's treating physicians and (ii) properly evaluate Bodden's credibility regarding the impact of her symptoms. On June 26, 2015, the Commissioner submitted a cross-motion for judgment on the pleadings, contending that there was substantial evidence to support the ALJ's decision.

## FACTUAL BACKGROUND

### I.  Bodden's Testimony

Bodden testified that she was single and lived with her children, ages 16, nine and seven. She completed school through the 11th grade. Bodden previously worked from home braiding hair for friends and family. Before that, she worked as a park maintenance worker for six months. Bodden stated that she had days when she did not want to leave the house and found it difficult to cook for her family or perform other household chores. She said she spent the majority of her time watching television, and that she frequently spent most of the day crying.

Bodden reported suffering from frequent headaches and back pain, for which she typically self-medicated with Motrin or Excedrin. She said that she took a generic form of Lexapro to treat her depression. She took Montelukast to treat her asthma. Due to her back pain, she said that she was only able to stand for approximately one hour at a time, and sit for a few hours at a time. She recalled that her doctor had once referred her to a physical therapist for her back pain, but that she had missed the appointment and never sought treatment.

## II.     Disability Opinions of Treating Physicians

### A.  Dr. Mini Liu, M.D.

Dr. Mini Liu, M.D., a family practitioner, began treating Bodden in September 2008 and diagnosed Bodden with post-traumatic stress disorder ("PTSD") on December 3, 2008. In support of her diagnosis, Dr. Liu wrote that Bodden presented with symptoms of depression, anxiety and insomnia. Dr. Liu noted that Bodden complained of heart palpitations and stabbing pains in her head. Dr. Liu prescribed Zoloft as a sleep aid and strongly recommended that Bodden begin therapy. Bodden refused, saying that therapy had never helped her in the past.

Throughout 2009, Dr. Liu consistently observed that Bodden displayed symptoms of depression, anhedonia and insomnia. She noted that Bodden continued to suffer from PTSD due to prior abusive relationships. In the fall of 2009, Dr. Liu diagnosed Bodden with diffuse hair loss and referred her to a dermatologist for treatment. In October 2009, Dr. Liu noted that Bodden had started to attend monthly psychiatric appointments and reported that she was "feeling a little better." (AR 376.)

On June 22, 2010, Dr. Liu completed a Multiple Impairment Questionnaire, in which she wrote that she had diagnosed Bodden with PTSD.  She listed Bodden's symptoms as depression, anhedonia, anxiety, insomnia and low self-esteem. Dr. Liu noted that Bodden's PTSD

3

"frequently" interfered with her attention and concentration, and that her impairments were likely to continue for at least twelve months. (AR 370.) She wrote that Bodden's impairments would likely produce "good days" and "bad days," and that Bodden was likely to be absent from work more than three times a month. Dr. Liu reported that Bodden was capable of performing low stress work, but she would be unable to work at a full-time competitive job that required activity on a sustained basis. (AR 371.)

In a letter accompanying the questionnaire, Dr. Liu noted that she had last seen Bodden on October 19, 2009. Since then, Bodden had been under the psychiatric care of physicians at St. Luke's Hospital. Dr. Liu wrote that she was not able to make an assessment of Bodden's current progress or prognosis, because she had not seen her in eight months.

In a second report dated January 28, 2011, Dr. Liu wrote that Bodden continued to suffer from PTSD, depression, asthma and alcohol abuse. She characterized these as chronic conditions, which could be improved but not resolved completely. Dr. Liu reported that Bodden continued to display lack of energy and focus, anhedonia, sleep and mood disturbances, difficulty thinking or concentrating and lack of energy.  She reported that Bodden was incapable of tolerating even low levels of stress. Dr. Liu wrote that Bodden was "markedly limited" in her ability to complete a normal workweek without interruptions from psychologically-based symptoms. (AR 390.) She also concluded that Bodden was "markedly" limited in her ability to accept instructions from and respond appropriately to criticism from supervisors and in her ability to travel to unfamiliar places or use public transportation. (AR 390–91.) Dr. Liu noted that she had most recently examined Bodden on November 24, 2010, and that she saw her every three to six months.

In a "Statement of Material Cause," dated February 2, 2011, Dr. Liu wrote that she believed Bodden was "totally disabled without consideration of any past or present drug and/or alcohol use." (AR 395.) She added that Bodden drank a daily glass of wine as a sleep aid before bed, but that she was working with her psychiatrist to find other solutions.

In a letter dated July 22, 2011, Dr. Liu reiterated many of her past findings regarding Bodden's mental health problems and her functional capabilities. She wrote that she had been treating Bodden every three to nine months since June 1999. Dr. Liu concluded: "[s]hould Ms. Bodden retain employment, I foresee her being absent, on average, more than three times a month and I am medically certain that her condition will last over 12 months." (AR 396.)

### B.  Dr. Mia Gintoft, M.D.

Bodden began psychiatric treatment with Dr. Mia Gintoft at St. Luke's Roosevelt Hospital Center in October 2009. Bodden told Dr. Gintoft that she had felt sad "all day most of the day" since January 2009, when she had ended a relationship. (AR 479.) She reported loss of interest in activities, feelings of helplessness, decreased energy, decreased appetite, weight loss, nail biting and insomnia. Bodden also shared with Dr. Gintoft her history of abuse at the hands of her father and ex-boyfriend. Bodden reported experiencing "nightmares, flashbacks, hyperviligence and avoidance" of family members. Id. Dr. Gintoft diagnosed Bodden with major depressive disorder and PTSD and assigned her a Global Assessment Functioning (GAF) score of 50. She prescribed Wellbutrin XL, to treat Bodden's depression, and Ambien, to help Bodden sleep. Dr. Gintoft noted in her report the Bodden had been unable to spell the word WORLD backwards, even after multiple tries.

Throughout December 2009 and January 2010, Dr. Gintoft observed improvements in Bodden's depression symptoms. She noted that Bodden's psychomotor activity was retarded and

her range was blunted, with a generally sad/depressed mood. Bodden was consistently unable to spell the word WORLD backwards, despite multiple tries. Bodden continued to complain about difficulties sleeping and Dr. Gintoft adjusted her Ambien prescription. At a visit in February 2010, Dr. Gintoft noted that Bodden was "[i]mproving, but has not yet reached optimum improvement" in her symptoms. (AR 499.)

In a letter from April 12, 2010, Dr. Gintoft wrote that Bodden had a diagnosis of major depressive disorder and PTSD and was currently prescribed Wellbutrin XL 150 mg and Zolpidem 10 mg.  She added that Bodden's symptoms had "mildly improved with treatment," but they "continue to impact her daily living." (AR 363.) Dr. Gintoft concluded that Bodden "would not be able to work for at least 12 months due to her condition." Id.

Throughout the spring of 2010, Bodden's moods varied from "euthymic" to "tearful." She informed Dr. Gintoft that she felt increasingly distressed after a disagreement with her family.

Throughout June 2010, Bodden missed four scheduled appointments at St. Luke's. After Bodden failed to appear for her fourth rescheduled appointment on June 30, 2010, Dr. Gintoft scheduled her to see a new psychiatrist, Dr. Sonya Lazarevic. (AR 511.)

**C.  Dr. Sonya Lazarevic, M.D.**

Dr. Lazarevic began treating Bodden in July 2010. Bodden often missed appointments and only met with Dr. Lazarevic four times between July and November 2010. In November 2010, Dr. Lazarevic wrote that Bodden's moods were unchanged and her depression symptoms remained the same. In March 2011, Bodden asked to be assigned to a different physician, stating the she was not "getting anywhere" with Dr. Lazarevic. (AR 513.)

In a mental status report dated May 25, 2011, Bodden reported a regression in her symptoms, stating that she was having difficulty sleeping and was anxious about her children's safety. Bodden stated that she was not consistently taking her medications and that she was experiencing side effects such as "nightmares, sleepwalking, grogginess and excessive need to sleep." (AR 515.) She admitted to drinking a glass of beer or wine a night to help her sleep. The counselor advised her to stop drinking entirely and to take her medications regularly. The status report notes that Bodden had been prescribed Seroquel to help her sleep.

**D.  Marika Labansat, MSW**

On June 15, 2011, Bodden began meeting regularly with Marika Labansat, MSW. Bodden initially presented with a "depressed affect" and often cried when discussing difficulties with her children. (AR 519.) In her treatment notes from January and February 2012, Ms. Labansat noted that Bodden appeared to be in sad or depressed moods during their meetings. Bodden often expressed her concerns about ongoing family issues, including her strained relationship with her son and her fear that her daughter would abandon her one day. Bodden identified her dysmorphia disorder as a cause of her social isolation and low self-esteem.

In the spring of 2012, Bodden expressed distress about her daughter's newly diagnosed diabetes. Bodden discussed her fears that her children would be harmed if they went outside, and told Ms. Labansat that she often forced her children to stay indoors.

Bodden missed several appointments during the summer. When she resumed her meetings with Ms. Labansat in the fall, she reported that she felt depressed and did not leave her house most days. Bodden reported seeing a man lurking in her bedroom and said that she felt fearful in her own apartment. Ms. Labansat encouraged Bodden to schedule an appointment with a psychiatrist.

In January and February of 2013, Bodden's mood fluctuated from "superficially cheerful" to "moderately depressed." (AR 603, 609.) She expressed continued concerns about her social isolation and her fears for her children.

**E.  Dr. Nina Tioleco, M.D.**

On September 21, 2012, Bodden began seeing Dr. Nina Tioleco, M.D., who found that Bodden's was "pleasant" and alert. (AR 685.) Dr. Tioleco assigned Boden a GAF score of 62. In October 2012, Dr. Tioleco noted that Bodden appeared "fearful" and was having thoughts of "persecution."  (AR 687.) She wrote that Bodden was experiencing visual hallucinations.

In a Psychiatric/Psychological Impairment Questionnaire dated February 14, 2013, Dr. Tioleco wrote that she had diagnosed Bodden with major depressive disorder. She assigned Bodden a GAF score of 62. Dr. Tioleco wrote that Bodden displayed symptoms of sleep and mood disturbance, emotional lability, feelings of guilt and worthlessness, difficulty thinking or concentration, social withdrawal or isolation, and decreased energy. She wrote that Bodden was "mildly limited" in her ability to remember detailed instructions, but displayed no evidence of limitations in her ability to follow and remember one or two-step instructions. (AR 732.) Dr. Tioleco noted that Bodden was "markedly limited" in her ability to maintain attention and concentration for extended periods of time, as well as in her abilities to perform activities within a schedule and maintain regular attendance. Id. She wrote that Bodden was "markedly limited" in her ability to complete a normal workweek without interruptions from psychologically-based symptoms. (AR 733.) Bodden was likewise "markedly limited" in her abilities to interact appropriately with the general public and to accept instructions and respond to criticism from supervisors. Id. Dr. Tioleco wrote that Bodden's impairments were ongoing and likely to last at least 12 months. She wrote that Bodden was incapable of even low stress work and that she had

"poor frustration tolerance." (AR 735.) Dr. Tioleco concluded that Bodden was likely to be absent from work more than three times a month as a result of her impairments.

Dr. Tioleco additionally submitted a statement on March 22, 2013, in which she wrote that Bodden's nightly glass of wine was not a contributing factor to her depression.

**F.  Dr. Adrienne Mishkin, M.D.**

In a report written February 20, 2013, Dr. Adrienne Mishkin wrote that she had been seeing Bodden regularly for continued treatment of depression since July 2012. She wrote that Bodden had major depressive disorder and PTSD with borderline traits and assigned her a GAF score of 60. Dr. Mishkin wrote that Bodden's symptoms of depression included "insomnia, low energy, poor concentration, feelings of helplessness, reduced hedonic tone, decreased ADLs, isolation, large weight losses, psychomotor agitation, and increased [alcohol] intake." (AR 619.) Dr. Mishkin wrote that past PTSD symptoms had included hyperviligence, avoidance, fear of death, nightmares, and flashbacks to physical abuse from her childhood, but noted that these symptoms were "now all resolved," and that Bodden was "mostly working on depression and being able to get her basic tasks done." Id. Dr. Mishkin wrote that Bodden had difficulty performing routine tasks, such as paying the bills, and that she became easily irritated around other people. Regarding Bodden's course of treatment, Dr. Mishkin wrote that there had been "no significant changes over the course of [the] year," due in part to Bodden's resistance to any attempts to change her medication regiment. Id. Dr. Mishkin reported that Bodden had attended most of her appointments and had been "mostly adherent" to her medications. She concluded that "[a]t this time, Ms. Bodden's depression prevents her from working and makes activities of daily living more difficult." (AR 620.)

9

III.    **Disability Opinions of Non-Treating Physicians**

    **A.  Dr. John Laurence Miller, Ph.D.**

On January 15, 2010, at the request of the Commissioner, psychologist Dr. John

Laurence Miller, Ph.D., examined Bodden. Dr. Miller noted that Bodden suffered from insomnia

and a lack of appetite. He wrote that she displayed "depressive symptomatology—[d]ysphoric

mood, crying spells, hopelessness, psychomotor agitation, fatigue, loss of energy, diminished

self-esteem, concentration difficulties, diminished sense of pleasure and social withdrawal, [and]

recurrent thoughts of death." (AR 336.) He also noted that she had symptoms of anxiety,

including "[e]xcessive apprehension and worry, nightmares, hypervigilance, [and] fearfulness of

almost all people." Id. Dr. Miller wrote that Bodden reported having panic attacks approximately

twice a month. He noted that Bodden had short-term memory deficits and difficulty

concentrating, including an inability to count in serial threes past the number 12. He noted that

Bodden was able to perform everyday tasks such as personal grooming, food preparation,

cleaning, laundry, shopping and managing her finances. Dr. Miller wrote that Bodden often got

lost and would need assistance with public transportation.

    Regarding Bodden's vocational functional capacity, Dr. Miller wrote that she was able to

follow and understand simple directions and instructions, but was not able to perform small tasks

independently. Dr. Miller wrote that Bodden was able to maintain a schedule. He noted that

although Bodden was capable of learning new tasks, she "cannot consistently maintain attention

and concentration." (AR 338.) Dr. Miller wrote that Bodden was incapable of dealing with stress

and that her stress-related and psychiatric problems "may significantly interfere with the

claimant's ability to function on a daily basis." Id. Dr. Miller diagnosed Bodden with PTSD,

secondary to sexual abuse and sexual assault. He wrote that she "urgently needs individual

psychological therapy" and added that if her treatment were effective, she "may be able to

benefit as well from vocational training." (AR 339.) Dr. Miller concluded that Bodden's prognosis was "fair." Id.

###### B.  Dr. V. Reddy

Dr. V. Reddy reviewed Bodden's medical records, including the psychiatric evaluation written by Dr. Miller, and drafted a report dated March 24, 2010. Based on the records, Dr. Reddy concluded that Bodden was mildly limited in her abilities to maintain social functioning and to perform activities of daily living. He found that Bodden experienced moderate difficulties in maintaining concentration, persistence or pace. Dr. Reddy wrote that Bodden was able to execute very short and simple instructions, maintain attention and concentration for extended periods, perform activities within a schedule and maintain regular attendance, and sustain an ordinary routine without special supervision. He also found that Bodden was able to complete a normal workday and workweek without interruptions from psychologically-based symptoms. Dr. Reddy noted that Bodden would likely be "moderately limited" in her ability to interact appropriately with the general public and to get along with coworkers and peers. (AR 355.)

In his evaluation of Bodden's functional capacity, Dr. Reddy noted that Bodden was able to carry out a regular, daily routine of caring for her children, cooking and performing household chores, and handling her finances. He wrote that Bodden's claims that she often became confused and lost when using public transportation were contradicted by the fact that she used various modes of public transportation to attend her exam with Dr. Miller. He also wrote that Bodden's claims of agoraphobia and panic attacks were not substantiated by her exam records. Dr. Reddy found that Dr. Miller's opinion that Bodden was unable to perform simple tasks independently was inconsistent with his examination notes, in which he had written that Bodden could "probably perform complex tasks independently." (AR 356.) Dr. Reddy wrote that Bodden's ability to maintain her household and care for her children was evidence of her

11

"mental flexibility and ability to tolerate changes." <u>Id</u>. He concluded that Bodden retained "the functional capacity to perform basic mental demands of the four general areas of functioning of unskilled work." <u>Id</u>.

### C.  Dr. Carlos M. Jusino-Berrios, M.D.

At the April 9, 2013, hearing, psychiatrist Carlos M. Jusino-Berrios ("Dr. Jusino") testified that based on his review of Bodden's records and the testimony presented at her hearing, he believed that her diagnoses of PTSD and major depressive disorder were justified. He stated that Bodden's symptoms did not fulfill C-level criteria for a disability. He rated her B criteria as B1 moderate, B2 moderate, B3 moderate and B4 none. Dr. Jusino testified that Bodden was able to understand, remember and execute simple two-step instructions, maintain attention, concentration, persistence and pace. He stated that Bodden would likely have occasional limitations on her interactions with other people. Dr. Jusino testified that the St. Luke's doctors' findings that Bodden was incapable of handling low levels of stress and would likely be absent from work three or more days a month were unfounded and unsupported by Bodden's treatment records. He stated that a GAF score of 50 was not "serious," but could be indicative of some moderate limitations. (AR 138.) When questioned by Bodden's attorney about the consistency between the findings of Dr. Miller and Dr. Tioleco, Dr. Jusino admitted that both physicians had found that Bodden was unable to maintain consistent concentration, relate adequately to other people or deal with stress.

### D.  Opinions of the Vocational Expert, Andrew Pasternak

At the April 9, 2013 administrative hearing, the ALJ presented vocational expert Andrew Pasternak with a hypothetical claimant with the following characteristics: Bodden's age, with the same lack of prior work experience, who was limited to simple routine tasks involving one or two step commands and no more than occasional social interactions, and who was sensitive to

environmental irritants. The ALJ then asked Mr. Pasternak to identify any jobs that this hypothetical claimant would be capable of performing. Mr. Pasternak stated that the claimant would be capable of working jobs that required a light level of physical exertion, such as hand packer, shirt folder and press machine operator. He also listed numerous sedentary jobs such as addressor clerk, document preparer and nut sorter.

Bodden's attorneys then presented Mr. Pasternak with a series of scenarios in which the hypothetical claimant's characteristics had been slightly altered. If the claimant were absent from work three or more days a month, Mr. Pasternak stated that she would be unable to sustain competitive employment on a regular basis. If the claimant were limited in her ability to maintain attention and concentration such that she were likely to be off-task 15 to 20 percent of the day, she would likewise not be able to sustain competitive employment.

## DISCUSSION

### I.    Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995) (*per curiam*). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial

evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). See also Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. See Brault v. Comm'r of Soc. Sec'y, 683 F.3d 443, 448 (2d Cir. 2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*" (citation and quotation marks omitted; emphasis in original)). "Before determining whether the Commissioner's conclusions are supported by substantial evidence, however, 'we must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Act." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (quoting Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) ("Cruz I")). "The Act must be liberally applied, for it is a remedial statute intended to include not exclude." Cruz I, 912 F.2d at 11.

Though generally entitled to deference, an ALJ's disability determination must be reversed or remanded if it is not supported by "substantial evidence" or contains legal error. See Rosa, 168 F.3d at 77. Thus, "in order to accommodate 'limited and meaningful' review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered." Rivera v. Astrue, 10 Civ. 4324 (RJD), 2012 WL 3614323, at *8 (E.D.N.Y.

14

Aug. 21, 2012) ("Rivera I") (citation omitted). Without doing so, the ALJ deprives the court of the ability to determine accurately whether his opinion is supported by substantial evidence and free of legal error. Where the ALJ fails to provide an adequate roadmap for his reasoning, remand is appropriate. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("[W]e do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").

## II.    Definition of Disability

A claimant is disabled under the Act if she demonstrates an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D). A claimant will be determined to be disabled only if the impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).[1]

Under the authority of the Act, the Social Security Administration ("SSA") has established a five-step sequential evaluation process when making disability determinations. See 20 C.F.R. § 416.920. The steps are followed in order: if it is determined that the claimant is not

---

[1] The statutory definition of "disability" in an SSI case under 42 U.S.C. § 1382c is "virtually identical" to the standard applied to disability insurance benefits cases under 42 U.S.C. § 423. Hankerson v. Harris, 636 F.2d 893, 895 n.2 (2d Cir. 1980). Because the same standard of review applies, courts cite to cases under 42 U.S.C. § 1382c and 42 U.S.C. § 423 "interchangeably." Id.

disabled at a step of the evaluation process, the evaluation will not progress to the next step. The

Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1 . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (citation omitted). A claimant bears

the burden of proof as to the first four steps. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). It

is only after the claimant proves that she cannot return to her previous work that the burden shifts

to the Commissioner to show, at step five, that other work exists in the national and local

economies that the claimant can perform, given her residual functional capacity ("RFC"), age,

education, and past relevant work experience. 20 C.F.R. § 416.960(c)(2); Melville, 198 F.3d at

51.

The Code of Federal Regulations provides additional guidance for evaluations of mental

impairments at step two of the analysis. Calling it a "complex and highly individualized

process," 20 C.F.R. § 416.920a(c)(1), the section focuses the ALJ's inquiry on determining how

the impairment "interferes with [the claimant's] ability to function independently, appropriately,

effectively, and on a sustained basis." 20 C.F.R. § 416.920a(c)(2). The main areas that are

assessed are: activities of daily living; social functioning; concentration, persistence or pace; and

episodes of decompensation. 20 C.F.R. § 416.920a(c)(3). The degree of limitation in the first

three functional areas are rated on a five-point scale: none, mild, moderate, marked and extreme.

20 C.F.R. § 416.920a(c)(4). The last area, episodes of decompensation, is rated on a four-point scale: none, one, two, three and four or more. Id. An impairment is classified as "severe" if the degree of limitation in the first three functional areas exceeds "none" or "mild," and exceeds "none" in the fourth area. 20 C.F.R. § 416.920a(d)(1). If an impairment is considered "severe," then the ALJ is instructed to determine whether the impairment qualifies as a listed mental disorder. 20 C.F.R. § § 416.920a(d)(2).

A mental disorder will qualify as a "listed impairment" if it is "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. To reach the required severity requirement, the individual must (A) show signs of depressive, manic or bipolar syndrome, and either (B) experience "marked restriction" in two of the following: (i) activities of daily living; (ii) maintaining social functioning; (iii) maintaining concentration, persistence, or pace; or (iv) repeated episodes of decompensation (the so-called "B Criteria"); or (C) have a "[m]edically documented history of chronic affective disorder of a least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support" and one of the following: (i) repeated episodes of decompensation, each of an extended duration; (ii) [a] residual disease process that has resulted in such a marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate; (iii) current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement (the so-called "C Criteria"). Id.

**III.    The ALJ's Determination**

In his April 24, 2013 decision, the ALJ found that Bodden had not been under a disability within the meaning of the Act since January 5, 2010, and denied her SSI application. Although the ALJ determined that Bodden had several severe impairments, including "very mild asthma, tension headaches, posttraumatic stress disorder (PTSD) and major depressive disorder," he concluded that Bodden retained the RFC to perform "a full range of work at all exertional levels, but she should avoid work around strong environmental irritants and she is limited to simple and routine tasks with one or two-step commands with no more than occasional social interactions with others." (AR 78–79.) Based on this finding, the ALJ concluded that there were representative occupations—such as hand packager, shirt folder, press machine operator, addressing clerk, and nut sorter—that Bodden could perform.

**IV.    Discussion**

On appeal, Bodden argues that the ALJ failed to weigh the evidence properly in violation of the treating physician rule, and that the ALJ failed to evaluate Bodden's credibility properly. In her cross-motion, the Commissioner argues that substantial evidence supports the ALJ's findings that Bodden was not disabled.

**A.  The Treating Physician Rule**

**1.  Legal Standard**

The "treating physician rule" instructs the ALJ to give controlling weight to the opinions of a claimant's treating physician, as long as the opinion is well-supported by medical findings and is not inconsistent with the other evidence in the record. 20 C.F.R. § 416.927(c)(2). Affording a treating physician's opinion controlling weight reflects the reasoned judgment that treating physicians are "most able to provide a detailed, longitudinal picture of [the claimant's]

medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(c)(2). See also Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient." (quoting Mongeur v. Heckler, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

Where mental health treatment is at issue, the treating physician rule takes on added importance. A mental health patient may have good days and bad days; she may respond to different stressors that are not always active. Thus, the longitudinal relationship between a mental health patient and her treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination. See Rodriguez v. Astrue, 07 Civ. 534 (WHP) (MHD), 2009 WL 637154, at *26 (S.D.N.Y. Mar. 9, 2009) ("The mandate of the treating-physician rule to give greater weight to the opinions of doctors who have a relationship with a plaintiff is particularly important in the mental-health context."). See also Canales v. Comm'r of Soc. Sec'y, 698 F. Supp. 2d 335, 342 (E.D.N.Y. 2010) ("Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health." (citing Richardson v. Astrue, 09 Civ. 1841 (SAS), 2009 WL 4793994, at *7 (S.D.N.Y. Dec. 14, 2009))).

In this Circuit, the treating physician rule is robust. The ALJ can discount a treating physician's opinion only if the ALJ believes that it "lack[s] support or [is] internally

inconsistent." Duncan v. Astrue, 09 Civ. 4462 (KAM), 2011 WL 1748549, at *19 (E.D.N.Y.

May 6, 2011). Only when the treating physician's opinion is inconsistent with other substantial

evidence in the record may a consultative physician's report constitute substantial evidence.

Guzman v. Astrue, 09 Civ. 3928 (PKC), 2011 WL 666194, at *9 (S.D.N.Y. Feb. 4, 2011).

"When other substantial evidence in the record conflicts with the treating physician's opinion,

however, that opinion will not be deemed controlling. And the less consistent that opinion is with

the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir.

1999).

When the ALJ discredits the opinion of a treating physician, the ALJ must follow a

structured evaluative procedure and explain his decision. See Rolon v. Comm'r of Soc. Sec'y,

994 F. Supp. 2d 496, 506 (S.D.N.Y 2014). The ALJ must explicitly consider: (1) the length of

the treatment relationship and the frequency of the examination; (2) the nature and extent of the

treatment relationship; (3) the evidence that supports the treating physician's report; (4) the

consistency of the treating physician's opinion with the record as a whole; (5) the specialization

of the physician in contrast to the condition being treated; and (6) any other significant factors.

20 C.F.R. § 416.927(c)(2)–(6); Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (holding that

"to override the opinion of a treating physician . . . the ALJ must explicitly consider" these

factors) (citing Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008))). This process must be

transparent: the regulations state that the Commissioner "will always give good reasons in our

notice of determination or decision for the weight we will give your treating source's opinion."

20 C.F.R. § 416.927(c)(2). Where an ALJ does not credit a treating physician's findings, the

claimant is entitled to an explanation. Snell, 177 F.3d at 134.

If the ALJ determines that the treating physician's opinions should not be afforded controlling weight, he is permitted to weigh the opinions of a non-examining physician over those of a treating physician. Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993). In order to override a treating source's opinion, the opinions of a nonexamining expert must be supported by "sufficient medical evidence in the record." Correale-Engelhart v. Astrue, 687 F. Supp. 2d 396, 427 (S.D.N.Y. 2010). But "[t]he findings of such consulting doctors are to be treated as opinion evidence pertinent to the nature and severity of the claimant's medical condition" and are "not to be relied upon . . . for the ultimate determination of disability." Id. Additionally, the ALJ should use the same six factors described above to determine the weight to give to a non-examining physician's opinion. 20 C.F.R. § 416.927(c)(2).

### 2.  Analysis

The ALJ's decision to deny Bodden benefits hinged primarily on his refusal to give controlling weight to the opinions of Bodden's treating physicians. Regarding the reports submitted by Dr. Liu, the ALJ noted that Dr. Liu had diagnosed various physical and psychiatric impairments and marked some mental functions as "markedly impaired." But he discounted Dr. Liu's opinions because she was "a family doctor and she is not the physician or from the clinic who provided most of the claimant's medical treatment." (AR 80.) Although she was not a specialist, Dr. Liu was the first physician to diagnose Bodden with PTSD and had treated Bodden since 2008. The ALJ did not identify evidence that undermined Dr. Liu's diagnosis, neither did he dispute her clinical findings. Indeed, Dr. Liu's findings that Bodden exhibited symptoms of a depressed affect, insomnia, adhedonia, poor self-esteem, mood disturbance, pervasive loss of interests, feelings of guilt and worthlessness and decreased energy were supported by the treatment notes of both Dr. Gintoft and Dr. Tioleco.

Additionally, the ALJ failed to discuss his application of the six-factor test in his determination to discount Dr. Liu's opinion. Although a physician's specialization is considered as one prong of this test, lack of specialization is an insufficient basis to reject the opinion of the treating physician. See Gonzalez v. Callahan, 94 Civ. 8747 (KMW), 1997 WL 279870, at *2 (S.D.N.Y. May 23, 1997) (holding that even though the treating physician was not a specialist, the six-factor test weighed in favor of giving controlling weight to his opinion); Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987) (holding that a family doctor is qualified to present "competent psychiatric evidence" regarding a claimant's mental health). The ALJ is thus not permitted to disregard the opinion of a treating physician based solely on the fact that the treating physician lacks a specialization in mental health; he must also consider the duration and frequency of the treatment relationship, the evidence that supports the treating physician's opinions, as well as the consistency of the treating physician's opinions with the record as a whole. All of these factors favor affording controlling weight to Dr. Liu's opinion.

In his discussion of Dr. Gintoft's report, the ALJ found that her determination that Bodden was incapable of working for 12 months was reserved for the Commissioner and was offered "only a few months after this claim was filed." (AR 80.) Although the ALJ noted that Dr. Gintoft had observed a mild improvement in Bodden's symptoms, he failed to recognize that in the same report Dr. Gintoft also wrote that Bodden's symptoms continued to impact her daily living. Additionally, the ALJ omitted any discussion of the weight that he assigned to Dr. Gintoft's opinions and treatment notes. Indeed, it appears that the ALJ may not have considered them at all in reaching his conclusion, in spite of the fact that Dr. Gintoft had treated Bodden regularly for over a year.

The ALJ likewise refused to give controlling weight to the medical source statement submitted by Dr. Tioleco, Bodden's most recent treating psychiatrist. In his cursory analysis, the ALJ found that Bodden's GAF score of 62 contradicted Dr. Tioleco's conclusion that Bodden was markedly impaired in several areas. A patient's GAF score, however, was meant to serve "as a global reference intended to aid in treatment" and "does not itself necessarily reveal a particular type of limitation and is not an assessment of a claimant's ability to work." Beck v. Colvin, 13 Civ. 6014 (MAT), 2014 WL 1837611, at *10 (W.D.N.Y. May 8, 2014) (internal quotation marks omitted). The ALJ inappropriately relied on Bodden's higher GAF score as justification for affording only "some weight" to Dr. Tioleco's report and for finding that her conclusions contradicted other evidence in the record. (AR 81.)

Aside from the GAF score, however, the ALJ failed to point to any specific evidence in the record that undermined Dr. Tioleco's opinions or that contradicted her treatment notes. In fact, Dr. Tioleco's findings that Bodden exhibited symptoms of sleep and mood disturbance, emotional lability, feelings of guilt and worthlessness, difficulty thinking or concentration, social withdrawal or isolation, and decreased energy were consistent with symptoms observed by Dr. Gintoft and by other treating physicians at St. Luke's Hospital. Furthermore, the ALJ failed to engage in the six-factor test in order to explain his rationale for only assigning "some weight" to Dr. Tioleco's opinions. Id.

Discussing the evidence submitted by the non-treating physicians, the ALJ found that Dr. Miller's opinion that Bodden had "marked difficulties in several areas" carried "little weight" because Dr. Miller had examined Bodden only one time, less than a month after she filed her application for disability benefits. (AR 80.) The ALJ also found that because Dr. Miller did not have access to Bodden's treatment records, he was unable to make a longitudinal assessment of

Bodden's symptoms. These conclusions appear pretextual, given that the Commissioner directed that this examination take place, knowing it would be a single visit completed soon after the application was filed. Additionally, although the findings of a non-treating physician generally should not be afforded controlling weight, Dr. Miller's observations and findings correlated strongly with those of Bodden's treating physicians, thus providing additional evidence to support their opinions.

The ALJ likewise erred in assigning controlling weight to the opinion of Dr. Jusino, a non-examining physician who never interacted with Bodden or observed her outside of the administrative hearing. The ALJ justified his decision to give "considerable weight" to Dr. Jusino's findings because Dr. Jusino had access to all of Bodden's records and had the opportunity to observe her during the hearing. (AR 81.) Although each treating physician may not have had access to Bodden's entire universe of medical records, they certainly had access to the years-long treatment records from their own practices. Additionally, Bodden's treating physicians observed her on numerous occasions, under circumstances where they were more likely to get a true sense of her capacity than during an administrative hearing that lasted only 25 minutes. The ALJ failed to cite "sufficient medical evidence in the record" to justify weighing Dr. Jusino's findings more heavily than the opinions of Bodden's treating physicians. Correale-Engelhart, 687 F. Supp. 2d at 427. In fact, the vast majority of the medical evidence directly contradicted Dr. Jusino's findings.

### B.  Credibility Finding

#### 1.    Legal Standard

In addition to arguing that the ALJ failed to apply correctly the treating physician rule, the plaintiff argues that the ALJ failed to evaluate properly Bodden's credibility. It is the ALJ's

role to evaluate a claimant's credibility and to decide whether to discredit a claimant's subjective

estimate of the degree of her impairment. Tejada v. Apfel, 167 F.3d 770, 775–76 (2d Cir. 1999).

See also 20 C.F.R. § 416.929(b) (dictating than an individual's subjective complaints alone do

not constitute conclusive evidence of a disability). In making a credibility determination, if a

claimant alleges symptoms of greater severity than established by the objective medical findings,

the ALJ should "consider all available evidence," including the claimant's daily activities, the

location, nature, extent, and duration of her symptoms, precipitating and aggravating factors, the

type, dosage, effectiveness and side effects of medications taken, and other treatment undertaken

to relieve symptoms. Cichocki v. Astrue, 534 F. App'x 71, 75–76 (2d Cir. 2013) ("Cichocki II")

(citing 20 C.F.R. §§ 416.929(c)(2), 416.929(c)(3)). Credibility is to be measured against

objective medical evidence, not against the ALJ's own assessment of a claimant's capacity. See

also Cruz v. Colvin, 12 Civ. 7346 (PAC) (AJP), 2013 WL 3333040, at *15–16 (S.D.N.Y. July 2,

2013) ("Cruz II") (holding that the ALJ must determine the claimant's credibility in light of the

objective record evidence).

   If the ALJ rejects the claimant's testimony after considering the objective medical

relevance, then he must provide a basis for his conclusion "with sufficient specificity to permit a

reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief and

whether his decision is supported by substantial evidence." Correale-Englehart, 687 F. Supp. 2d

at 435–36.

### 2.   Analysis

   The ALJ determined that Bodden was not fully credible "because the treatment notes and

her statements suggest that she can perform all ADLs on a daily basis and she can travel

independently on her own without an assistive device." (AR 81.) Although the treatment records

support the ALJ's finding that Bodden was generally able to perform all basic activities of daily living, including doing the laundry, taking her children to school, performing household chores, and cooking for her family, these facts alone do not support a finding that she was capable of working 40 hours a week in a competitive work environment. In his evaluation of Bodden's credibility, the ALJ examined only Bodden's daily activities and failed to consider any of the other relevant factors as required by the Regulations, such as the duration, frequency and intensity of her symptoms, precipitating and aggravating factors, any medications or other treatment that Bodden was using to treat her symptoms, and any other factors relating to her functional limitations due to her symptoms. See 20 C.F.R. §§ 416.929(c)(3).

 The ALJ's finding that Bodden was able to perform "simple and routine tasks with one or two-step commands" is based on Dr. Tioleco's report, to which the ALJ only assigned "some weight." (AR 79, 81.) The ALJ also appeared to ignore the rest of the report, in which Dr. Tioleco wrote that Bodden was "markedly limited" in her ability to complete a normal workweek without interruptions from psychologically-based symptoms and was likewise "markedly limited" in her abilities to interact appropriately with the general public. (AR 733.) Additionally, both Drs. Liu and Tioleco found Bodden to be "markedly limited" in her attention and concentration, and Dr. Tioleco noted that Bodden was consistently unable to spell the word WORLD backwards, even after multiple attempts. The ALJ therefore failed to provide "with sufficient specificity" the reasons for his conclusion that Bodden's statements regarding the intensity, persistence and limiting effects of her symptoms were not credible and contradicted her treatment records. Correale-Englehart, 687 F. Supp. 2d at 435.

## **CONCLUSION**

For the aforementioned reasons, I find that the ALJ failed to apply the treating physician rule correctly and to analyze properly Bodden's credibility. Accordingly, the plaintiff's motion for judgment on the pleadings is GRANTED, and the Commissioner's cross motion for judgment on the pleadings is DENIED. The case is REMANDED for proper analysis in line with this decision.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge


DATED:      New York, New York
            December 14, 2015